******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# IN RE CHARLI M.*
## (AC 47510)

Bright, C. J., and Suarez and Clark, Js.

*Syllabus*

The respondent father appealed from the trial court's judgment rendered for the petitioner, the Commissioner of Children and Families, terminating the father's parental rights as to his minor child, C. On appeal, the father claimed, inter alia, that the court erred in concluding that the Department of Children and Families made reasonable efforts to reunify him with C. *Held*:

The trial court's finding that the department made reasonable efforts to reunify the respondent father with C was supported by sufficient evidence in the record.

The trial court properly determined, by clear and convincing evidence, that the respondent father failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of C, he could assume a responsible position in her life.

It was not improper for the trial court to rely on certain police reports in support of its finding that the respondent father was involved in incidents of domestic violence because the father did not object to the admission of the police reports at trial and the court considered and weighed the contents of the admitted police reports as only one factor supporting its ultimate conclusion that the father failed to rehabilitate.

The trial court properly found that the respondent father's inconsistent visitation history with C, considered in light of the record in its entirety, supported the conclusion that the father failed to rehabilitate.

The trial court properly credited the testimony of R, a court-appointed evaluator and expert in clinical and forensic psychology, and relied on that testimony in support of its conclusion that the father failed to rehabilitate

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the court.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

because, although R's in person evaluation of the father was conducted more than two years prior to trial, R testified that she reviewed more recent materials, all of which were admitted as full exhibits, and that her present opinions and recommendations were based on her review of such records, and the father had ample opportunity to cross-examine R.

Argued September 13—officially released November 6, 2024**

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of New London, Juvenile Matters at Waterford, where the respondent mother consented to the termination of her parental rights; thereafter, the case was tried to the court, *Hon. John C. Driscoll*, judge trial referee; judgment terminating the respondents' parental rights, from which the respondent father appealed to this court. *Affirmed.*

*Matthew C. Eagan*, assigned counsel, for the appellant (respondent father).

*Samuel J. Shapiro*, assistant attorney general, with whom were *Patrick T. Ring*, assistant attorney general, and, on the brief, *William Tong*, attorney general, and *Nisa Khan*, assistant attorney general, for the appellee (petitioner).

*Opinion*

CLARK, J. The respondent father, Tyler M., appeals from the judgment of the trial court rendered in favor of the petitioner, the Commissioner of Children and Families, terminating his parental rights as to his minor child, Charli M. (Charli).[1] The respondent claims that

---

** November 6, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The petitioner also sought to terminate the parental rights of Charli's mother. The mother later consented to such termination and is not a participant in this appeal. Accordingly, all references in this opinion to the respondent are to Tyler M. only.

the trial court erred in concluding that (1) the Department of Children and Families (department) made reasonable efforts to reunify the respondent with Charli and that he was unable or unwilling to benefit from the department's reunification efforts, and (2) the respondent failed to achieve a sufficient degree of personal rehabilitation. We affirm the judgment of the trial court.

The following facts, as found by the trial court, and procedural history are relevant to our resolution of this appeal. "[Charli] was born [in March, 2021]. . . . [Charli] is [the] fourth biological child [of the respondent and Charli's mother]. The mother and [the respondent] began a relationship in 2012. The department became involved with the family in 2013 after receiving a report of domestic violence between the parents when the mother was approximately eight months pregnant. The department's concerns at that time particularly centered on substance abuse by the parents, domestic violence between the parents, and the need for mental health treatment. In 2014, the department received reports of ongoing domestic violence between the mother and [the respondent], including the issuance of protective orders. In 2015, further reports of domestic violence between the parents were received, including violation of an active protective order. The parents' second child was born in 2015. In 2016, the department received more reports of domestic violence as well as reports that [the respondent] was abusing pills and heroin. In March, 2016, [the respondent] was arrested for possession of heroin with intent to sell. At the time, it was noted that the parents were homeless, and the department believed they lacked insight into their parenting deficits." The two oldest children were removed from the care of the respondent and the mother in March, 2016, and committed to the custody of the petitioner in July, 2016. "[G]uardianship of the two oldest

children was transferred to their paternal grandmother on April 11, 2017.

"[O]n September 12, 2018, the mother gave birth to the [parents'] third child. On September 14, 2018, the third child was removed from their care. [The respondent's] parental rights to this child were terminated on July 27, 2021 . . . . The presenting issues in that child's case were largely the same as the two older siblings: domestic violence, substance abuse, unstable housing, and a need for consistent mental health treatment.

"The department was notified of Charli's birth by the hospital on the day of [her] birth. The mother at the time was a resident of an inpatient drug treatment program in Putnam. [The respondent] was incarcerated at the time. The mother had entered the [drug treatment] program on February 2, 2021, having been referred there by the office of adult probation. At the time of admission, the mother tested positive for cocaine and benzodiazepines. She also attempted to bring in multiple syringes, unidentified pills, and two containers of urine. On April 7, 2021, the department imposed an administrative ninety-six hour hold on [Charli]. On April 8, 2021, the [petitioner] obtained an ex parte order of temporary custody from the court, *Hoffman, J.*, vesting temporary custody of Charli in the [petitioner]. The child then was placed with fictive kin, her only placement to date. On April 16, 2021, the order of temporary custody was sustained. On November 16, 2021, the mother and [the respondent] submitted pleas of nolo contendere, [and] [Charli] was adjudicated neglected and committed to the [petitioner's custody]. Specific steps for reunification of the child were set [at] the time of the order of temporary custody and served on [the respondent].

"[The respondent's] presenting issues for Charli were essentially the same as they had been for his three

older children. They included his criminal behavior, especially his domestic violence with the mother, his unstable housing and income, his untreated mental health needs, his substance abuse needs, and lack of consistent contact with [Charli]. [The respondent's] specific steps were designed to address these concerns. . . .

"[The respondent] first met [Charli] when she was five months old at the office of Dr. [Nancy] Randall. The department had made a timely referral for a psychological evaluation of [the respondent], including a parent-child interactional. . . .

"Randall evaluated [the respondent] in August, 2021. She opined that [the respondent] had a significant history of substance abuse, as well as significant anger issues. She also noted his guarded disclosures. She was concerned about [the respondent's] criminal history, particularly his domestic violence, his long history of substance abuse, and his instability in housing and employment. She indicated that [the respondent] should address his individual issues in order to provide parenting reunification. She recommended that he participate in at least weekly, consistent visitation. She recommended that he participate in individual counseling to work on interpersonal relationships, domestic violence, and moving toward more independence and stability. She recommended continued substance abuse treatment including drug testing and regular drug counseling with a consistent counselor, supplemented by twelve step meetings at least three times [per] week. Most importantly, she recommended that [the respondent] should not be considered appropriate for reunification if further incidents of domestic violence occurred and that stable housing and income were necessities for reunification. . . .

"[The respondent] was involved in domestic violence incidents with the mother thrice following [Randall's]

evaluation. On the night of August 29, 2022, the mother called the Ansonia Police Department to report a verbal dispute with [the respondent]. The police responded, but no arrest was made. On January 2, 2023, the Ansonia Police Department responded to a 911 call from the mother at 4:50 a.m. A neighbor in a second floor apartment reported [that] the argument on the first floor was so loud that she was awakened. The police had difficulty gaining entrance to [the respondent's] apartment and obtained contradictory and implausible stories from the mother and [the respondent]." The respondent was arrested and charged with disorderly conduct in violation of General Statutes § 53a-182. "The mother was screened for domestic violence lethality and assessed as a high danger based upon her score. She did not wish to cooperate. Two weeks later, on January 15, 2023 . . . the Ansonia Police Department responded to the home, again at the mother's request, and again contradictory statements were given by the mother and [the respondent]. Both were arrested as a result of the incident." The respondent was charged with assault in the third degree in violation of General Statutes § 53a-61 and disorderly conduct in violation of § 53a-182.

On March 23, 2023, the petitioner filed a petition to terminate the respondent's parental rights, which alleged that the respondent failed to achieve a sufficient degree of personal rehabilitation pursuant to General Statutes § 17a-112 (j) (3) (B) and (E).[2] The court, *Hon.*

---

[2] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, except that such finding is not required if the court has determined at a hearing pursuant to section 17a-111b, or determines at trial on the petition, that such efforts are not required, (2) termination is in the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected, abused or uncared for in a prior proceeding . . .

*John C. Driscoll*, judge trial referee, held a trial on August 31 and October 5, 2023. On January 29, 2024, the court issued a memorandum of decision granting the petition. The court found by clear and convincing evidence that the department made reasonable efforts to reunify Charli with the respondent, that the respondent was unable or unwilling to benefit from those reunification efforts, and that he had failed to achieve a sufficient degree of personal rehabilitation to encourage the belief that within a reasonable time he could assume a responsible position in Charli's life. This appeal followed.[3] Additional facts will be set forth as necessary.

I

The respondent first claims that the trial court erred in concluding that the department made reasonable efforts to reunify him with Charli.[4] We disagree.

and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . [or] (E) the parent of a child under the age of seven years who is neglected, abused or uncared for, has failed, is unable or is unwilling to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child and such parent's parental rights of another child were previously terminated pursuant to a petition filed by the Commissioner of Children and Families . . . ."

[3] Pursuant to Practice Book §§ 67-13 and 79a-6 (c), the attorney for the minor child filed a statement with this court adopting the brief of the petitioner and supporting the affirmance of the judgment terminating the respondent's parental rights.

[4] The respondent also argues that the provision of § 17a-112 (j) (1) excusing the petitioner from making reasonable efforts to reunify "if the court has determined at a hearing pursuant to section 17a-111b . . . that such efforts are not required" is unconstitutional because it "allows for an impermissible end run around the clear and convincing evidentiary standard required, as a matter of due process, in all termination hearings." As the respondent acknowledges, however, the petitioner did not rely on that provision in the petition, and the trial court found, on the basis of clear and convincing

The following legal principles and standard of review govern our resolution of the respondent's claim. "The reasonableness of the department's efforts must be assessed in the context of each case. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible. . . . [R]easonableness is an objective standard . . . and whether reasonable efforts have been proven depends on the careful consideration of the circumstances of each individual case. . . .

"Our review of the court's reasonable efforts determination is subject to the evidentiary sufficiency standard of review [which asks] whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . In so doing, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court and will not disturb the court's subordinate factual findings unless they are clearly erroneous." (Citation omitted; internal quotation marks omitted.) *In re Judah B.*, 221 Conn. App. 387, 394–95, 300 A.3d 1253 (2023).

In reviewing the trial court's reasonable efforts determination, this court "[does] not examine the record to

evidence, that the department made reasonable efforts to reunify the respondent and Charli. Accordingly, we need not address the respondent's constitutional claim. See *In re Kyreese L.*, 220 Conn. App. 705, 714 n.6, 299 A.3d 296 (declining to address identical claim "[b]ecause the court properly found, on the basis of clear and convincing evidence, that the department made reasonable efforts to reunify the respondent and the child"), cert. denied, 348 Conn. 901, 300 A.3d 1166 (2023).

determine whether the trier of fact could have reached a conclusion other than the one reached. . . . In our review of the record for evidentiary sufficiency, we are mindful that, as a reviewing court, [w]e cannot retry the facts or pass upon the credibility of the witnesses. . . . Rather, [i]t is within the province of the trial court, when sitting as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence.'' (Internal quotation marks omitted.) *In re Caiden B.*, 220 Conn. App. 326, 349, 297 A.3d 1025, cert. denied, 348 Conn. 904, 301 A.3d 527 (2023).

The evidence before the trial court reveals that the department referred the respondent to the Quality Parenting Center at The Village (QPC) for supervised visitation with Charli, in which the respondent participated from April through July, 2022. After the respondent missed two visits in April, 2022, due to reported issues with transportation, the department offered to arrange transportation for him. Despite the department's efforts, the respondent was discharged from QPC after he missed consecutive visits without notice in July, 2022. The department then referred the respondent to Kids Advocates, which provided supervised visitation beginning in August, 2022. Although the department again offered to arrange transportation for the respondent, he missed nine of forty-five scheduled visits, several of which were due to alleged transportation issues.

The department also assisted the respondent with locating a therapist by providing him with online resources from which he could search for a provider in his area based on his specific needs. Once the respondent reported that he had found a therapist, the department communicated with the therapist to review the respondent's specific steps and the issues that needed to be addressed to facilitate reunification, including intimate partner violence (IPV). The department also discussed with the respondent the importance of

addressing IPV and anger management with his therapist. Although the respondent told the department that he started seeing the therapist in February, 2022, the therapist reported to the department in November, 2022, that she had only been working with the respondent for three months. The trial court found that, "[a]fter those three months, [the respondent] became grossly inconsistent" with his therapy.

The department also referred the respondent to supportive housing, a housing assistance program, in an effort to help him find a home suitable for raising a child. The trial court found that, "[f]ollowing his discharge from incarceration, [the respondent] was in a halfway house until October, 2021, at which time he moved into a shelter. In March, 2022, [the respondent] provided documentation indicating he had been living in a motel [since] November, 2021." Amanda Parsons, the social worker employed by the department who oversaw the respondent's case, testified that she visited the respondent at the motel and told him that, to facilitate reunification, it was important that he find housing appropriate for raising a child. Initially, the respondent was ineligible for supportive housing because the program allows only one parent to participate at a time, and the department already had referred the mother. In May or June, 2022, the department transitioned the supportive housing referral from the mother to the respondent and started working with employees of the program to locate appropriate housing for the respondent. In September, 2022, however, the respondent obtained an apartment on his own, which made him ineligible for supportive housing.

In addition, there was evidence that the department made other reunification efforts. The respondent was referred to Boys & Girls Village for a reunification readiness assessment, which was conducted from December, 2022, through January, 2023. The respondent, however, cancelled two of the eight scheduled appointments

and did not disclose that he was arrested twice for domestic violence incidents around the same time as the assessment. Parsons also testified that she referred the respondent to Fatherhood Engagement Services, but he declined to participate. On the basis of all of the efforts described herein, the trial court found by clear and convincing evidence that the department made reasonable efforts to reunify the respondent with Charli.

In challenging the trial court's reasonable efforts determination, the respondent focuses primarily on the fact that the department did not refer him to a specialized IPV program. The respondent argues that "[t]he failure to provide appropriate IPV counseling significantly impacted the case" because IPV "was the most significant issue preventing reunification." As noted previously, however, the department communicated with the respondent and his therapist about the importance of addressing IPV as part of his counseling, and the therapist confirmed that she was addressing such issues with the respondent. There is no evidence that the respondent ever claimed that his therapist's efforts were insufficient or that he requested that the department refer him to a specialized IPV program. To the contrary, the record suggests that, to the extent the respondent did not sufficiently address his IPV issues in therapy, it was due to his failure consistently to engage with his therapist, rather than any deficiency with respect to the department's reunification efforts. See *In re Nevaeh W.*, 154 Conn. App. 156, 164–66, 107 A.3d 539 (2014) (determination of whether department made reasonable efforts to reunify may be assessed in light of respondent's failure to engage in services), rev'd in part on other grounds, 317 Conn. 723, 120 A.3d 1177 (2015).

Moreover, it is well established that "[r]easonable efforts means doing everything reasonable, not everything possible," and that "courts are instructed to look

to the totality of the facts and circumstances presented in each individual case in deciding whether reasonable efforts have been made." (Internal quotation marks omitted.) *In re Caiden B.*, supra, 220 Conn. App. 349–50. Furthermore, "[o]ur focus in conducting a review for evidentiary sufficiency is not on the question of whether there exists support for a different finding—the proper inquiry is whether there is enough evidence in the record to support the finding that the trial court made." (Internal quotation marks omitted.) *In re Lillyanne D.*, 215 Conn. App. 61, 88, 281 A.3d 521, cert. denied, 345 Conn. 913, 283 A.3d 981 (2022). Thus, the question for this court is not whether some evidence would support a determination that the department should have referred the respondent to an IPV program but, rather, whether the totality of the evidence supports the trial court's finding that the department's reunification efforts, considered cumulatively, were reasonable. See, e.g., *In re L. T.*, 220 Conn. App. 680, 694–95, 299 A.3d 1229 (2023) (respondent's claim that department's decision not to make referral for specific service rendered its reunification efforts unreasonable "ignores the principle that the department need not do everything possible, just everything reasonable, to promote reunification"); *In re Alexander T.*, 81 Conn. App. 668, 673, 841 A.2d 274 ("[i]n light of the entire record, the failure to provide [a] referral [for a psychiatric examination], while a lapse, does not make the overall efforts of the department fall below the level of what is reasonable"), cert. denied, 268 Conn. 924, 848 A.2d 472 (2004). On the basis of our review of the record, we conclude that there is sufficient evidence to support the trial court's finding that the department made reasonable efforts to reunify the respondent with Charli.[5]

---

[5] The respondent also claims that the trial court erred in concluding that he was unable or unwilling to benefit from the department's reunification efforts. Pursuant to § 17a-112 (j) (1), however, "[t]he [petitioner] must prove [by clear and convincing evidence] *either* that [the department] has made reasonable efforts to reunify or, *alternatively*, that the parent is unwilling

## II

The respondent also claims that the trial court erred in concluding that he failed to rehabilitate. We disagree.

The following legal principles and standard of review govern the respondent's claim. "In the adjudicatory phase of a termination of parental rights proceeding, the court must determine whether one of the . . . statutory grounds that may serve as a basis for termination of parental rights exists. . . . Failure of a parent to achieve sufficient personal rehabilitation is one of [the] statutory grounds on which a court may terminate parental rights pursuant to § 17a-112. . . . That ground exists when a parent of a child whom the court has found to be neglected fails to achieve such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, the parent could assume a responsible position in the life of that child." (Internal quotation marks omitted.) *In re Aurora H.*, 222 Conn. App. 307, 317–18, 304 A.3d 875, cert. denied, 348 Conn. 931, 306 A.3d 1 (2023).

"Personal rehabilitation as used in [§ 17a-112 (j) (3) (B)] refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . The statute does not require [a parent] to prove precisely when [he] will be able to assume a responsible position in [his] child's life. Nor does it require [him] to prove that [he] will be able to assume full responsibility for [his] child, unaided by available support systems.

___

or unable to benefit from the reunification efforts. Section 17a-112 (j) clearly provides that the [petitioner] is not required to prove both circumstances. Rather, either showing is sufficient to satisfy this statutory element." (Emphasis in original; internal quotation marks omitted.) *In re Caiden B.*, supra, 220 Conn. App. 361 n.22. Because we conclude that there is sufficient evidence to support the trial court's reasonable efforts determination, we need not address the respondent's claim that the court erred in concluding that he was unable or unwilling to benefit from the department's reunification efforts.

. . . Rather, [§ 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [the parent] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he] can assume a responsible position in [his] child's life." (Internal quotation marks omitted.) *In re Kyreese L.*, 220 Conn. App. 705, 719, 299 A.3d 296, cert. denied, 348 Conn. 901, 300 A.3d 1166 (2023).

"A conclusion of failure to rehabilitate is drawn from *both* the trial court's factual findings and from its weighing of the facts in assessing whether those findings satisfy the failure to rehabilitate ground set forth in § 17a-112 (j) (3) (B). Accordingly . . . the appropriate standard of review is one of evidentiary sufficiency, that is, whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court." (Emphasis in original; internal quotation marks omitted.) *In re Shane M.*, 318 Conn. 569, 587–88, 122 A.3d 1247 (2015).[6]

The following additional facts and procedural history are relevant to our resolution of this claim. On August

---

[6] "Prior to *In re Shane M.*, supra, 318 Conn. 569, courts had applied the clear error standard of review both to a trial court's determination that a parent failed to rehabilitate and to that court's subordinate factual findings." *In re Kyreese L.*, supra, 220 Conn. App. 720 n.8. In his brief, the respondent argues that "the standard of review as established by our Supreme Court in *In re Shane M.* should be replaced by the former clear error standard." As the respondent acknowledges, however, this court "is bound by the precedent from our Supreme Court and is unable to modify it." *In re Denzel W.*, 225 Conn. App. 354, 380 n.14, 315 A.3d 346, cert. denied, 349 Conn. 918, 317 A.3d 1 (2024).

31, 2023, prior to the commencement of evidence, the trial court asked the parties whether there were "any agreements as to anything, including exhibits . . . ." The petitioner's counsel notified the court that the parties stipulated that the state had entered a nolle prosequi on the criminal charges against the respondent stemming from the January 2 and 15, 2023 arrests. The petitioner's counsel further notified the court that the parties agreed to the admission of all proposed exhibits except for portions of an affidavit and a social study, both prepared by Parsons. The respondent's counsel argued that references to certain criminal charges from 2013 and 2016 should be redacted from the affidavit and social study. The trial court overruled both objections. Police reports relating to the three incidents involving the respondent and the mother were admitted as full exhibits by agreement of the parties.

At trial, Parsons testified regarding the department's reunification efforts and its concerns about the respondent's ability to provide a safe and stable home for Charli. Parsons testified that, although the respondent was able to maintain his sobriety, he did not meaningfully address the other concerns reflected in his specific steps, namely, his involvement in domestic violence, lack of stable housing and employment, and need for consistent mental health treatment. In addition, Parsons testified that the respondent was not forthright with the department about his lack of progress in complying with his specific steps. With respect to the domestic violence incidents involving the mother, Parsons testified that the respondent did not notify the department about the arrests or the underlying incidents. In fact, the respondent repeatedly insisted to the department that, other than to speak about Charli, he no longer maintained a relationship with the mother. Contrary to his representations to the department, the respondent told the police at the time of his January 2, 2023 arrest

that the mother was his girlfriend, and he listed her as a source of support for Charli during the reunification assessment with Boys & Girls Village.

Parsons also testified that, around the time the department referred the respondent to supportive housing, he told Parsons that he would not have any problem affording an apartment and that his primary obstacle was locating an apartment close to his work. Yet the respondent stopped paying rent for his apartment in November, 2022, just two months after he signed the lease, and his landlord commenced eviction proceedings in March, 2023. In addition, the respondent lost his job in February, 2023, but he did not notify the department until May, 2023. Even then, he told the department that "he was able to pay his rent and utilities based on his unemployment [benefits]," even though at that point he had not paid rent for approximately six months.

As discussed previously, the respondent also told the department that he found a therapist in February, 2022, but the therapist told Parsons in November, 2022, that she had been seeing the respondent for only three months. At the time of trial, the respondent had not seen his therapist in approximately five months. Parsons also testified that the respondent missed four supervised visits with Charli before being discharged from QPC and nine of forty-five visits while engaged with Kids Advocates. The respondent often cited difficulties with transportation as a reason for missing such visits, even though the department repeatedly offered to arrange transportation for him. The respondent also missed two visits without notice while engaged with QPC and one while engaged with Kids Advocates.

The court also considered the report and testimony of Randall, a court-appointed evaluator and expert in clinical and forensic psychology. Based on her in person

evaluation of the respondent in August, 2021, Randall recommended that the respondent participate in weekly visitation with Charli and that he engage in individual therapy to address his issues with interpersonal relationships and domestic violence. She further recommended that stable housing and income should be considered necessary to support reunification and that reunification would not be appropriate if the respondent was involved in any further incidents of domestic violence.

At trial, Randall testified that, following her in person evaluation of the respondent, she reviewed the social study prepared by Parsons, an addendum to the social study, the respondent's criminal history, and the police reports relating to the August, 2022 and January, 2023 incidents between the respondent and the mother. On the basis of that review, Randall had several concerns regarding the respondent's ability to properly care for Charli. First, she found it "very concerning" that "there have still continued to be incidents of domestic violence between [the respondent and the mother]." Relatedly, Randall was concerned that in light of the couple's long history of domestic violence and the mother's active substance abuse, the respondent's ongoing, close interpersonal relationship with the mother may put Charli at risk. Specifically, Randall testified that spending time with a person who is actively using illegal drugs is "probably the most common trigger to relapse" and that by maintaining an ongoing relationship with the mother, the respondent "put himself at risk for relapsing . . . ." She further testified that substance abuse can be a trigger for episodes of domestic violence and that the respondent's relationship with the mother while she was actively using illegal drugs "increases the risk for domestic violence" and calls into question the respondent's ability to provide "a stable, safe home" for Charli.

Randall also testified that the respondent's repeated failure to maintain housing and employment indicates that the respondent "is not taking control of . . . those basic steps that need to happen to be a parent and care for his child in the home." She explained that because Charli has only ever lived with her current foster parents, removing her from that home would result in trauma and "she would need additional care more than most [children her age] because of that experience." She testified that the respondent "has not demonstrated that he is able to really be consistent in the treatments" and that she "question[ed] his willingness to participate in services that [Charli] would need . . . ."

Finally, Randall testified that she was especially concerned that the respondent's failure consistently to follow through with supervised visitation calls into question his ability to establish and maintain a consistent relationship with Charli. She testified that, especially at Charli's age, the respondent's failure consistently to be there for her could create trust issues and have a damaging impact on how Charli views relationships in general. Ultimately, Randall opined "that it would not be appropriate or safe for Charli to be returned to [the respondent] at this time."

On the basis of the evidence presented, the trial court found that, although the respondent "has made a laudable effort" by achieving and maintaining sobriety since his release from incarceration, "[the respondent's] sobriety is his only consistent compliance with his reunification steps." The court found that the respondent "did not obtain stable housing, employment, visitation, or an appropriate interpersonal relationship with the mother." The court further found that the respondent's involvement in three incidents of domestic violence "directly contravened [Randall's] recommendation" and demonstrated that the respondent "had not mastered his anger or learned coping skills to deal with

the tensions surrounding a difficult interpersonal relationship." The court shared Randall's concern that the respondent "continued his relationship with the mother despite his awareness that [she] has not addressed her significant substance abuse history and was actively using illegal drugs [at the time of the arrests]," noting that "[t]his exposure puts [the respondent's] sobriety at risk and increases the likelihood of domestic violence." Finally, the court found that the respondent's "inability or unwillingness to maintain consistent, regular visitation demonstrates a lack of insight into his parenting obligations and his daughter's needs." The trial court concluded that the respondent failed to achieve a degree of personal rehabilitation that would encourage the belief that, within a reasonable time, considering the age and needs of the child, he could assume a responsible position in Charli's life.

On appeal, the respondent presents three arguments in support of his claim that the trial court erred in concluding that he failed to rehabilitate. First, the respondent argues that the court improperly relied on the police reports in support of its finding that he was involved in incidents of domestic violence. Second, the respondent argues that the record does not support the court's factual findings regarding the respondent's visitation history. Third, the respondent argues that the court gave undue weight to the expert opinion of Randall. We address each argument in turn.

The respondent first argues that the trial court could not rely on the police reports to support its finding that he was involved in incidents of domestic violence because such reports "can only show that a police officer determined there was probable cause to make an arrest," which "does not rise to the level of clear and convincing evidence." This argument is unavailing for two reasons.

First, the respondent did not object to the admission of the police reports at trial.[7] It is well settled that "[w]henever evidence is admitted without objection, the trier of fact can rely on its contents for whatever they are worth on their face." (Internal quotation marks omitted.) *In re Kasmaesha C.*, 148 Conn. App. 666, 678, 84 A.3d 1279, cert. denied, 311 Conn. 937, 88 A.3d 549 (2014). "Hearsay evidence admitted because no objection was voiced can be considered to prove the matters in issue for whatever its worth on its face. . . . If the evidence is received without objection, it becomes part of the evidence in the case, and is usable as proof to the extent of the rational persuasive power it may have." (Citations omitted; internal quotation marks omitted.) *Dufresne* v. *Dufresne*, 191 Conn. App. 532, 546–47, 215 A.3d 1259 (2019). Because the respondent did not object to the admission of the police reports, it was within the province of the trial court to determine the probative value of such reports in determining whether the respondent failed to rehabilitate. See *In re Gabriella A.*, 319 Conn. 775, 790, 127 A.3d 948 (2015) ("[i]t is within the province of the trial court, when sitting as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence" (internal quotation marks omitted)).

Second, the respondent's argument misapprehends the manner in which the court relied on the police reports. Although the mere fact that the respondent was arrested would, as the respondent contends, "only show that a police officer determined there was probable cause to

---

[7] In his principal appellate brief, the respondent states that he "objected to certain aspects of the police [reports]" but not to the reports in their entirety. The respondent does not, however, provide any citation to the record to support his assertion. As discussed previously, the record reflects that the respondent objected only to the admission of portions of Parsons' affidavit and the social study. After the court overruled those objections, the respondent's counsel stated, "that is the last of . . . my objections." All other exhibits, including the police reports, were admitted by agreement.

make an arrest," the court's decision did not rely on the fact that the respondent was arrested. Rather, the court considered and weighed the *contents* of the admitted police reports—which included the responding officers' observations, as well as statements of the respondent, the mother, and the respondent's neighbor—as a factor supporting its ultimate determination that the respondent failed to rehabilitate. Specifically, the police reports described the respondent's volatile interactions with the mother—while she was actively abusing illegal substances—during a crucial period in which the respondent was attempting to reunify with Charli. As discussed previously, the court agreed with Randall that, given that "substance abuse has played a significant role in [prior incidents of] domestic violence between the mother and [the respondent]," the respondent's ongoing relationship with the mother despite her active substance abuse "puts [the respondent's] sobriety at risk and increases the likelihood of domestic violence." The court relied on the content of the police reports in finding that the incidents between the respondent and the mother "directly contravened [Randall's] recommendation" and demonstrated that "[the respondent] had not mastered his anger or learned coping skills to deal with the tensions surrounding a difficult interpersonal relationship."

The trial court was not required to make these subsidiary factual findings on the basis of clear and convincing evidence. In *In re Zamora S.*, 123 Conn. App. 103, 998 A.2d 1279 (2010), this court recognized that "§ 17a-112 (j) requires the petitioner to establish three specific elements by clear and convincing evidence in order to prevail on a termination of parental rights petition," namely, that (1) the department made reasonable efforts to reunify the parent and child or that the parent was unable or unwilling to benefit from such efforts, (2) termination of parental rights is in the best interest

of the child, and (3) one of the statutory grounds for termination set forth in § 17a-112 (j) (3) exists. Id., 112. This court further recognized, however, that "any subordinate facts that, together, led the court to the conclusion that those elements have been met need not be proven by that heightened standard of proof." Id., 114. Here, the court's subsidiary findings regarding the respondent's ongoing relationship with the mother and involvement in domestic violence incidents supported its ultimate determination that the respondent failed to rehabilitate, and the court properly considered the police reports in support of such findings. See id., 113 (where failure to rehabilitate was alleged as ground for termination of parental rights, respondent's ongoing involvement in relationship marked by domestic violence "was relevant as a subordinate fact to the court's eventual finding of whether the respondent had, in fact, failed to rehabilitate herself").

We further note that the incidents of domestic violence that were documented in the police reports were not the sole basis for the court's conclusion that the respondent failed to rehabilitate. Rather, as noted previously, the court also found that the respondent "did not obtain stable housing, employment, visitation, or an appropriate interpersonal relationship with the mother." The court further found it significant that, "[e]ven with a termination petition pending, [the respondent] could not demonstrate consistent follow-through on services." Finally, the court credited Randall's testimony "that whatever efforts [the respondent] was making were too little and too late" and "[gave] added weight to her opinion that it would not be appropriate or safe to return [Charli] to [the respondent] . . . ." On the basis of all of its subsidiary findings, the court determined by clear and convincing evidence that the respondent failed to achieve sufficient rehabilitation to "encourage the belief that within a reasonable period

of time [the respondent] could assume a responsible position [in] the life of [Charli]." Accordingly, we conclude that the trial court did not improperly rely on the police reports as one factor that supported its ultimate determination that the respondent failed to rehabilitate.

With respect to the respondent's argument that the record does not support the trial court's subsidiary factual findings regarding his visitation history, the respondent points to a finding, contained in the portion of the memorandum of decision addressing whether termination of parental rights was in the best interest of Charli, that the respondent "missed 20 percent of his scheduled visits without a valid excuse."[8] The respondent argues that the evidence does not support the finding that he had no "valid excuse" because, of the nine visits he missed while engaged with Kids Advocates, he missed three visits due to illness and five visits due to "transportation issues." We are not persuaded.

We first note that the respondent appears to assume that, because the record demonstrates that he had provided a reason for missing the visits in question, there was no basis for the trial court to find that he missed such visits "without a valid excuse." In reviewing the record for evidentiary sufficiency, however, "[o]ur function as an appellate court is to review and not retry the proceeding . . . . The probative force of conflicting

---

[8] On appeal, the respondent does not challenge the trial court's conclusion that termination of his parental rights was in Charli's best interest. Although the court relied on the fact that the respondent missed 20 percent of his visits while engaged with Kids Advocates in concluding that the respondent failed to rehabilitate, in so concluding, the court did not expressly rely on the separate finding in its best interest analysis that the respondent had no "valid excuse" for missing such visits. Moreover, for the reasons explained herein, even assuming that the court's finding that the respondent had no valid excuse for the missed visits did, in fact, form part of the basis for its conclusion that the respondent failed to rehabilitate, we conclude that the court's findings regarding the respondent's visitation history are reasonably supported by the record.

evidence is for the trier to determine." (Internal quotation marks omitted.) *In re Nevaeh W.*, supra, 154 Conn. App. 170. Moreover, "[w]e will not disturb the court's subordinate factual findings unless they are clearly erroneous. . . . A factual finding is clearly erroneous when it is not supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the definite and firm conviction that a mistake has been made." (Internal quotation marks omitted.) *In re Niya B.*, 223 Conn. App. 471, 490, 308 A.3d 604, cert. denied, 348 Conn. 958, 310 A.3d 960 (2024). In the present case, the petitioner presented testimony that specifically called into question the validity of the respondent's excuses for the visits he missed due to alleged transportation issues. Specifically, Parsons testified that the department repeatedly offered to arrange transportation for the respondent, but he declined to take advantage of such offers. The trial court was free to credit such testimony in assessing the respondent's visitation history.

Moreover, the respondent focuses solely on the trial court's statistical finding that he missed 20 percent of his visits while engaged with Kids Advocates, while ignoring the full context of the court's factual findings regarding his visitation history. The court, however, took a broader view of the evidence by discussing the respondent's overall commitment to supervised visitation based on his record with QPC *and* Kids Advocates. Specifically, the court found that when the department referred the respondent to QPC, "[i]t took at least four attempts before an intake could be scheduled," and that, although "[the respondent] participated in this visitation, [he] was discharged in August, 2022, after two consecutive no call/no show visits." The court then found that after the department referred the respondent to Kids Advocates, he received "[a] very positive report"

but "missed 20 percent of his available visits." Furthermore, although not referenced in the memorandum of decision, the record also reflects that, in addition to the two "no call/no show" visits that resulted in the respondent's discharge from QPC, he missed at least two other visits while engaged with QPC due to alleged transportation issues.

Additionally, Randall testified that, "regardless of the reason, for [the respondent] to miss multiple visits ongoing with his daughter, that's a letdown for her . . . [e]very time that she expects there to be a visit, and then he doesn't show up. So that to me is something that is very significant for her." The court relied on Randall's opinion in finding that the missed visits "would have a deleterious effect upon a young child, creating trust issues for that child." On the basis of the entire record, the court ultimately found that "[the respondent's] inability or unwillingness to maintain consistent, regular visitation demonstrates a lack of insight into his parenting obligations and his daughter's needs." Considering the record in its entirety and construing the evidence in the light most favorable to sustaining the trial court's judgment, we conclude that the court properly found that the respondent's inconsistent visitation history supported the conclusion that he failed to rehabilitate.

Finally, the respondent argues that the trial court erred by giving "added weight" to Randall's testimony because her opinion was based on outdated information. Relying on this court's decisions in *O'Neill* v. *O'Neill*, 13 Conn. App. 300, 536 A.2d 978, cert. denied, 207 Conn. 806, 540 A.2d 374 (1988), and *Merkel* v. *Hill*, 189 Conn. App. 779, 207 A.3d 1115 (2019), the respondent argues that Randall's testimony was "stale" because her in person evaluation occurred more than two years before trial.

The respondent's reliance on *O'Neill* and *Merkel* is misplaced. In *O'Neill*, the trial court in a dissolution of marriage action awarded sole custody of the parties' child to the father on the basis of a family relations case study report written thirteen months before trial. See *O'Neill* v. *O'Neill*, supra, 13 Conn. App. 302. In reversing the judgment of the trial court, this court noted that the case study report referred to past events in the mother's life "which [were] not probative of [her] present parenting abilities" and that the family relations officer who authored the report expressly testified "that due to the passage of time he could not competently testify as to whether the parties' stability and security had changed since his report." Id., 303. This court concluded that the trial court erred in relying on the outdated report because it "[did] not focus on the present abilities or infirmities of the [mother] as they may affect her ability to be a primary caretaker of the child." Id.

Similarly, in *Merkel*, this court reversed a judgment modifying a child custody and parental access plan because the trial court adopted recommendations from a family relations custody report completed ten months before trial, despite the family relations counselor's testimony that she had no updated information about the family and could not confirm that her recommendations were still valid. See *Merkel* v. *Hill*, supra, 189 Conn. App. 788–89. The counselor "testified that she could not opine as to the particulars of the report at issue because she was not expecting to testify that day" and "had not reviewed the file, report, or notes" prior to her testimony. Id., 784. The counselor further testified that she believed her report would have been "outdated after six months" and that she had "no basis to say that it's still valid . . . [and] would be doing a disservice to the minor child to say that." (Internal quotation marks omitted.) Id., 785. This court concluded that the trial court erred because, "[n]otwithstanding the staleness

of the report and the testimony of [the counselor] that it did not represent her present recommendations, the court surprisingly found that [the counselor's] testimony 'validated the report and her recommendations,' and . . . adopted her stale recommendations as its own." Id., 789.

Unlike in *O'Neill* and *Merkel*, Randall testified that, prior to trial, she reviewed Parsons' social study, an addendum to the social study, the respondent's criminal history, and the police reports and that her present opinions and recommendations were based on her review of such records. All of the materials that Randall reviewed were admitted as full exhibits, so the respondent had ample opportunity to cross-examine Randall concerning her testimony. The record reflects that the respondent availed himself of that opportunity. For example, the respondent's counsel elicited from Randall that her knowledge of the respondent's visitation history and reunification assessment was based solely on the social study and that she had not reviewed the underlying documentation. In addition, the respondent's counsel emphasized during closing argument that "Randall had only met Charli and . . . [the respondent] once" and argued that her evaluation "was so long ago at this point [that] the recommendations are not up to date."

Contrary to the respondent's argument, it was not improper for the trial court to credit Randall's testimony and to rely on that testimony in support of the conclusion that the respondent failed to rehabilitate. "It is well established that [i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . The credibility and the weight of expert testimony is judged by the same standard, and the trial court is privileged to adopt whatever testimony [it] reasonably believes to be credible. . . . On appeal, we do not retry

the facts or pass on the credibility of witnesses. . . . It is the quintessential function of the fact finder to reject or accept certain evidence, and to believe or disbelieve any expert testimony. . . . The trier may accept or reject, in whole or in part, the testimony of an expert offered by one party or the other." (Internal quotation marks omitted.) *In re Aubrey K.*, 216 Conn. App. 632, 658–59, 285 A.3d 1153 (2022), cert. denied, 345 Conn. 972, 286 A.3d 907 (2023).

On the basis of our review of the record, we conclude that the evidence was sufficient to support the conclusion that the respondent failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of Charli, he could assume a responsible position in her life.

The judgment is affirmed.

In this opinion the other judges concurred.